IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

JAMES DUNHAM, JR.

Defendant.

15-CR-10110-DPW

# GOVERNMENT'S SENTENCING MEMORANDUM

For years, the defendant, James Dunham, Jr., sold confidential business information, stolen from his employer, to a Wall Street analyst. The analyst used Dunham's information—which included sales, return and other data concerning publicly traded companies—in research reports distributed to a select group of investors. Dunham pleaded guilty to one count of wire fraud in relation to a single instance of passing such information in April 2013. But as is clear from both the Information and the Pre-Sentence Report ("PSR"), this was not a one-time slip up, but rather part of a pattern of providing valuable, confidential business secrets that were not otherwise available, in exchange for payments.

The PSR calculates Dunham's Guidelines sentencing range—with the loss adjustment based on the value of the payments Dunham received—as 12-18 months in prison. In light of Dunham's extraordinarily prompt acceptance of responsibility, the government recommends a sentence of 10 months of confinement, to include 5 months incarceration and 5 months of home confinement. A term of incarceration is both reasonable and appropriate in this case not simply as punishment for a serious crime, but also to send a strong general deterrent message. Unless the gatekeepers of business secrets—like Dunham—are held accountable when they leak that

confidential information—in violation of their duties to employers, clients and, in some cases, shareholders—the black market for inside information will continue to flourish.

**Background**

As set forth in the PSR, James Dunham is the former Chief Operating Officer of the Wireless Franchisor, which is one of a handful of "indirect agents" for a Major Wireless Provider.[1] As an indirect agent, the Wireless Franchisor operates 400 retail outlets that sell services and products offered by the Major Wireless Provider. The Wireless Franchisor, and specifically its retail outlets, also sell smartphones and other devices manufactured by various smartphone manufacturers, including the Major Smartphone Manufacturer. As Dunham was very much aware, the Wireless Franchisor's relationships with the Major Wireless Provider and the Major Smartphone Manufacturer (both of which are publicly traded companies), as well as other smart phone manufacturers, are critical to its existence. In his position at the Wireless Franchisor, Dunham had access to confidential business information regarding the Wireless Franchisor, the Major Wireless Provider and the Major Smartphone Manufacturer, including but not limited to sales, return and other data.

The charges arise out of Dunham's secret consulting relationship with a Boston-based firm that provides investment research to institutional clients, including hedge funds (the "Research Firm"). In May 2010, Dunham entered into a consulting agreement with the Research Firm, pursuant to which Dunham provided the Research Firm, and a specific analyst at the Firm, with information and insight into the wireless industry. Dunham did not disclose the Research Firm relationship to the Wireless Franchisor, nor did he seek authorization to enter into the agreement, as he was required to do. According to the analyst, Dunham's information was

[1] The Wireless Franchisor, Major Wireless Provider and the Major Smartphone Manufacturer are identified in the PSR.

valuable because he provided "real time" information based on what was happening in the Wireless Franchisor's 400 retail stores, which information then was the basis for research reports authored by the analyst and distributed to the Research Firm's investor clients. In exchange for his consulting services, the Research Firm paid Dunham $2,000 per month.

The scheme came to light in April 2013 in connection with information Dunham provided to the analyst about sales and returns of a newly released smartphone. Specifically, at the end of March 2013, the Major Smartphone Manufacturer released its much anticipated smartphone—the success or failure of which was widely considered critical to the troubled company's prospects. By early April, reports had been circulating that the smartphone's sales had been lagging and so the analyst reached out to Dunham to see if he could obtain more specific information on sales. In an April 10, 2013 telephone call, Dunham told the analyst that some Wireless Franchisor stores were seeing returns of the smartphone exceeding sales. This information was not publicly available and was highly confidential to the Wireless Franchisor, as well as to the Wireless Franchisor's business partners. The analyst used that information in a research report that his Firm published the next day. That same day, the share price of the Major Smartphone Manufacturer's stock dropped more than seven percent and the Major Smartphone Manufacturer publicly disputed the accuracy of the information. In fact, the information was accurate, in-so-far as it reflected what was happening in the Wireless Franchisor's stores, although it may not have been accurate with respect to the Major Smartphone Manufacturer's overall sales and returns.

Dunham's April 2013 disclosure was not an isolated event. Rather, as set forth in the Information and the PSR, Dunham regularly disclosed confidential business information to the analyst, including data concerning "gross adds" (the total of new subscribers to the Major

Wireless Provider's network) as well as product launch and supply information for various smartphones offered by the Major Wireless Provider and sold through the Wireless Franchisor's stores. As the analyst has explained, Dunham's value was in providing information that was not publicly, or otherwise, available.

**The Government's Sentencing Recommendation**

The government recommends a sentence of 10 months confinement, to include 5 months incarceration and 5 months home confinement, to be followed by 12 months supervised release, and a fine of $3,000. The government also asks the Court to order forfeiture in the amount of $61,000, which represents the payments Dunham received over the course of the scheme. As set forth further below, the recommended sentence reflects the seriousness of the offense, the history and characteristics of this defendant and will deter other insiders tempted to sell confidential business information.

**I. The Seriousness of the Offense**

Regulations concerning the disclosure of material information exist to guarantee that the owners of confidential business information—the public companies and the entities with which they do business—disclose accurate information to the entire investing public at the same time. Insiders, like Dunham who take it upon themselves to selectively share confidential information, for their own gain, can undermine the integrity of the markets. Indeed, Dunham's disclosures to a Wall Street analyst who, as Dunham knew, distributed the information to his clients arguably caused more harm to the markets than the company insider who simply tips his buddy so that the two can make a little extra money by insider trading.

To be clear, the government has not taken the position that Dunham's disclosure in April 2013 regarding the Major Smartphone Manufacturer, alone, caused the seven percent drop in

stock price. And the government does not contend that Dunham should be held accountable for such a significant loss. That said, the fact that the stock price dropped so dramatically, not because of information disclosed by the Major Smartphone Manufacturer itself, but rather based on rumors in a series of analyst reports—including the one issued by the Research Firm containing Dunham's information—demonstrates why selective disclosure of confidential business information can be disruptive to the markets.

The selective disclosure of inside information, when done deceitfully and for one's own gain, is a serious crime, with serious consequences. In this case, where Dunham's gain was relatively modest—just over $60,000 over a period of years—Dunham is not facing a significant jail sentence. But the offense itself *is* serious, and his sentence should reflect that.

**II. The History and Characteristics of the Defendant**

Dunham was the second most senior executive at the Wireless Franchisor when he entered into the secret consulting agreement with the Research Firm. Dunham reported directly to the chief executive officer (whose official title was Managing Director). As Chief Operating Officer, Dunham was entrusted with virtually all forms of the Wireless Franchisor's confidential business information, including information regarding sales of various products. Dunham also was intimately involved with the Wireless Franchisor's relationships with the Major Wireless Provider, the Major Smartphone Manufacturer and other business relationships and, as he has admitted, understood the importance of those relationships to the Wireless Franchisor's business.

Notwithstanding his high rank and access, Dunham never mentioned his consulting relationship to anyone at the Wireless Franchisor. Despite signing agreements that specifically addressed the appropriate use of confidential business information, and the need to disclose outside business activities, Dunham never sought permission to consult. Even if Dunham had

limited his "consulting" to providing high-level insight into the wireless industry—which he did not—providing such consulting services, without any notice to his employer, would have been a significant breach of trust. But of course, Dunham went much further and actually disclosed the confidential information with which he had been entrusted. He did so repeatedly, for years disclosing confidential sales and other information that formed the basis of report after report issued by the Research Firm. And he was paid to disclose that information.

Dunham's high-level role at the Wireless Franchisor and his repeated breaches of trust, breaches that had the potential to cause detriment not just his own employer, but also to the companies with which it did business—further demonstrating the need for a significant sentence.

## III. The Need for General Deterrence

While general deterrence is always an important factor, it is particularly critical here. Despite the recent crackdown on insider trading, the market for inside information continues to flourish. Indeed, Dunham was not the only "consultant" retained by the Research Firm and so-called "expert networks" designed to connect "experts" in various industries with investors still exist. Many of these networks appear specifically designed to create a buffer between the traders and insiders. But the end game is often the same, no matter how many layers are put in place: to get inside information into the hands of select traders who can profit based on an unfair advantage. As set forth above, this selective disclosure undermines the integrity of the securities markets.

The sentence imposed must deter others who are doing, or inclined to do, the same.

## Conclusion

For the foregoing reasons, the government respectfully recommends a sentence of 10 months confinement, to include 5 months incarceration and 5 months home confinement, to be followed by 12 months supervised release, and a fine of $3,000.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ Sarah E. Walters
Sarah E. Walters
Assistant U.S. Attorney

Dated: September 11, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: September 11, 2015

/s/ Sarah E. Walters
Sarah E. Walters
Assistant U.S. Attorney